All right. Our second case for this morning is United States v. Sinovel Wind Group. So whenever you're ready, Mr. Elwood. Chief Judge Wood, may it please the Court. The key question before the Court today is whether Sinovel Wind Group, a foreign company and one of the world's largest manufacturers of wind turbines, was even properly before the District Court when there's no dispute that neither of the explicit requirements of Criminal Rule 4 were met for Sinovel itself. So can we start, though, with appellate jurisdiction? Because I take it that the government concedes that, at a minimum, this is properly here as a mandamus case. But, of course, the standards on mandamus are different. And you have argued that this belongs under the collateral order doctrine. And I'm very concerned myself that, after the Supreme Court's Mohawk decision and other signals from the Court that the collateral order doctrine is to be policed very carefully, that it really doesn't. Because I'm having trouble seeing why every decision refusing to quash a criminal summons  Well, to begin with, I think that I will acknowledge that I think it's a more straightforward case to be made under mandamus. And I was planning on focusing my comments on mandamus, but I'm happy to begin with the collateral order doctrine. I think that, you know, there's not any question, I don't think, with respect to this being, you know, conclusively resolving the issue. And I'm happy to... I mean, for the District Court. But, of course, people can make an appeal. They can say, you should have quashed the summons. And then an appellate court can give full relief on that. Right, but I think the thing that separates this from the run of cases is we're talking about whether that party is even properly before the court. And specifically, whether a foreign company, and specifically a foreign state-owned company, is before the court. But it's not a foreign state-owned company. It doesn't fall within the definition of foreign state from the Foreign Sovereign Immunities Act. The Chinese government has an 18% interest, as I understand from the record. And I actually think the FSIA hurts you a little bit in that Congress has drawn a line at the point where the foreign sovereign interests become so significant that an entire set of procedures are triggered. This is not over that line. Well, I will acknowledge that, Your Honor. But, I mean, that is talking about to invoke immunity. Or the exceptions. It's not just immunity. It's jurisdiction. It's method of service of process. It's the ability to have assets attached. And this is a commercial activity. But the Supreme Court said in Samatar v. Yusuf that if something isn't addressed in the Foreign Sovereign Immunities Act, it doesn't mean that Congress excluded everything else. That is just the procedures that trigger the specific protections and the immunity of the Foreign Sovereign Immunities Act. We're not asking for immunity. All we're asking for is essentially a thumb on the scale that before you go into court, before you can hail a foreign corporation and a partly state-owned foreign corporation into court in, you know, foreign sovereign, that you get to have, you know, appellate supervision, appellate review of the case before it gets there. But there's no rule to that effect. I mean, we know, or at least I would take the position that if the United States has brought this case, the Department of Justice has probably consulted with the State Department about whether the foreign relations implications of this litigation are a price worth paying. And I suppose we could ask for the views of the Solicitor General on that point. But here we have a case brought by the United States. It was a case, as we said, of Bokhari and Kashimu, which were both prosecutions of, you know, foreign citizens. And the court did not stop to think. I mean, it did not essentially defer to the federal government and say because they're criminal prosecutions that we aren't going to worry about foreign relations aspects of them. So back to Judge Wood's original question. So what is it special about this that invokes the Collateral Order Diagnosis? The things that make it special are that it involves two things. It involves itself an aggressive reading of Criminal Rule 4. And you combine that with a foreign citizen and a partly state-owned foreign citizen. In addition to that, we have the fact that, as we've noted, this is already the subject of ongoing proceedings in China. Wait a second. So it can't be that the fact that it's a hotly disputed legal question is enough to invoke the Collateral Order Diagnosis, right? No. Is it the fact that it's a foreign entity? Is that what it is? Right, that there is, as the court said in Hejazi, which was a mandamus case, that there is a substantial question about whether this party is even properly before the court. And before you do the, you know, the exceptional step of bringing a foreign citizen to a different country to prosecute it for crimes, you should have, you know, should make sure that the trip is really necessary, essentially. But the problem in Hejazi was that there was, it was a standoff. There was no way that you were ever going to get adjudication of that issue if the court hadn't stepped in and required a decision. Whereas here, I mean, the summons has not been quashed. There's going to be a proceeding. The company will decide whether, you know, how aggressively to defend, and there will be an outcome and an opportunity for an appeal. But, I mean, Hejazi was a mandamus case.  Bokhari, as you well know. But Bokhari and Kashimu were both done on collateral order doctrine. And it was because it is not an adequate remedy on appeal after you've subjected a foreign entity to, you know, basically the ordeal of a trial in a foreign jurisdiction to say, oh, sorry, we didn't really mean to do that, or we didn't really need to do that. And I think that is what sets it apart. And in addition to the fact that it's a foreign citizen and a foreign state-owned company is the fact that this is already, heightening the comedy concerns, is the fact that this is the disputed issue here. The copyright dispute and the trade secret dispute are already being adjudicated by the courts of China. It's already been to the Chinese Supreme Court. In civil proceedings. Right, exactly. But, I mean, it's the same issue. And, in fact, there's already been a trial on the copyright issues. And, I mean, there could be a judgment at any point on that. As far as you know, there has not been yet? There has not been. I mean, I checked last week. But there has been a trial and a judgment could come any day. And, I mean, even in the United States, I mean, it would not be uncommon to put a criminal prosecution on hold if there were a civil proceeding that would, you know, directly inform it or that had a lot to do with it. Well, it would be extremely uncommon. Yeah, I think it would be extremely uncommon. I mean, the opposite is usually true. The civil case is put on hold while the criminal case... I think an appropriate sign of respect to some other sovereign in order to let that case run its course before we subject it to the same. We basically retry it under a different standard of proof in the United States. And, in any event, I mean, if it looks like collateral order doctrine is a dark horse, I think that Mandamus standards, I think, is a much clearer case. But let me tell you at least the essence of my problem there. I mean, jurisdiction, fine. But when you start to think about Mandamus, it's an extraordinary writ. It should be used only when there's no adequate remedy of law that you really have to take this step. And if, as I'm at least hypothesizing, certainly as the government argues, if the company, your client, would have the opportunity to present its arguments, all the arguments that you're raising about why the summons should have been quashed on appeal, then it's hard for me to see how the criteria for Mandamus have been met. So maybe we could talk about that for a minute. And I don't want you to lose the time because I actually have some points I want to make about Rule 4B as well. But, like, for example, in Abla's versus OTP Bank, there they found the standards for Mandamus to be satisfied. And part of the reason why they thought that was an irreparable injury was subjecting a foreign, you know, in a civil case, a foreign privately owned bank to jurisdiction of the United States. In addition, there is the Barringer pharmaceutical case where they found an irreparable injury to require foreign witnesses to appear in the United States for deposition. But, of course, as you say those words, you know that that's not enough by itself. Because we live in a world where there's an enormous amount of international commerce, and some of it is on the criminal side of the docket and much of it is on the civil side of the docket. And so foreign entities appear in U.S. courts every day. Foreign witnesses testify. There are ways of getting evidence under Hague Conventions. There are ways of getting evidence otherwise. Some countries let you do it cooperatively. There are a whole set of ways of managing this. So you're saying this litigation somehow needs to be carved out, shouldn't have to answer for itself for these allegations in the indictment of violations of U.S. criminal law. The thing that I think sets this apart from, and you know, makes it so we don't really have to worry about the floodgate concerns, is this is a particular type of issue. It's about whether they're even properly in the court at all. We're not talking about bringing up immediate appeal of evidentiary rulings or discovery things or motions in limine or anything like that. But you were saying they weren't properly in the court because they're Chinese. And they're just all sorts of- And that they weren't even served right. And I mean, if you look at Fink v. Igoe, this court has held civil service of process to be immediately reviewable on mandamus. Cooper, In re Cooper, the 11th Circuit held the same thing. And more recently, this court in Bolsonaro, I think it was Bolsonaro, yes, held that denial of a motion to transfer was itself immediately reviewable. And so when you have these questions about whether this is even the right place for this action to be going forward, that is something the court has already expressed a level of comfort in addressing through mandamus proceedings. And when you add to that the fact that this involves a foreign company, the fact that it involves a criminal prosecution, and the fact that it involves a criminal prosecution of a foreign, partly state-owned enterprise. I mean, this is not an everyday case. Even, I mean, when you think about the whole universe of cases that they've tried to use alter, the government has tried to use alter ego jurisdiction over, you know, you can count them on the fingers of one hand or maybe a hand and an additional thumb. So on that point, I just wanted to throw in the thought before you sit down, that under criminal rule 4C, as it now reads, forget what the Rules Committee is considering. It doesn't talk about a summons served on a corporation. It talks about a summons served on an organization. It's a broader word than corporation. And I myself am very, very reluctant to think that parents and subsidiaries are always just one big organization, having begun my life at the Department of State defending against that position in international fora. But the facts of this case, you know, who was selling these turbines, this little tiny operation they had with the one employee in Houston and all the stuff being done in China. On the facts of this case, it seems to me a rational thing, at least, for the district court to think these two, at least, were really just all one big organization. So maybe you can respond to that. Well, to begin with, there's not any allegation that the one employee of Sinovel USA was involved in this. If you go through and look at the allegations in the indictment, it all involves Sinovel China. No, he didn't seem to be doing much of anything, actually, except moving the documents out of the – I mean, the one employee of Sinovel USA had no involvement in this, and there's really no allegation in the indictment, to the contrary. But what was Sinovel USA doing? I was trying to extract that from the record. They had this little rent-an-office in Houston, and they had an apartment, and they had the one employee, and people seemed to drift in and out who were doing wind turbine business for the Chinese parent. What are they doing? Sinovel China was attempting to do business – No, what's Sinovel USA doing? Oh, I'm sorry. Sinovel USA was attempting to do business in its own name in this country. And the thing is, you know, it took a while to get it stood up. It took a while for them to hire their own employee. But when they had that employee hired, they paid their own taxes. They paid the rent on the office in Houston. They paid for the car, the corporate car there. Sinovel USA had a minor bank account. It didn't seem like it was all that much of it. Besides paying rent, were they actually doing business? They were attempting to get business. But, I mean, 2013, the year that the office closed, was the year that the tax credit for wind turbines ran out. And so, I mean, it just was not as much of an economic business model after that point. But, I mean, under the government's theory, it doesn't even matter that Sinovel USA was engaged in selling wind turbines. But under my theory, at least, you know, as I say, I'm absolutely with you that the government shouldn't run around and just serve subsidiaries, wholly owned or otherwise, of foreign companies. Because that's not a rule that they want extended to the globe. You know, Union Carbide has a U.S. office and they have an Indian subsidiary. And they don't want people in India to serve the Indian subsidiary and drag in the U.S. Union Carbide and so on. We could probably think of a million examples of U.S. parents that have foreign-based subsidiaries. So, that rule, it seems to me, is far too sweeping and not appropriate. But I thought the government was also making a more factually bound argument that in this case, Sinovel China was really the organization and Sinovel USA, even if it was observing certain corporate formalities, just wasn't enough of an entity to be a separate organization. It was really all part of the same thing. So, the Rule 4C3, capital C, rule, someone served on an organization. As I understand their argument, they say it was followed. But a couple of points that need to be made, or about three points, I will say. First, there's nothing about the fact that they were selling wind turbines, Sinovel USA, that plays any role in the government's theory. If they were selling tennis shoes or pool cues, it would all be the same. All that matters is that they didn't observe the corporate formalities between the two of them. And secondly, even taking that at face value... Or the question would be, should these two particular entities be considered one organization for purposes of the service rule? I think for two reasons. Even if you take that at face value, and if my white light weren't on, I would go more into the facts. But there are two independently sufficient legal reasons why not. One of them, and I'll head straight to the Delaware law one, since we've already talked a little about Rule 4, is that under the governing Delaware law, it requires fraud in the use of the corporate form. And I will say that the Delaware courts have held repeatedly and recently, Reed v. Sineskalki 2011, that they will not pierce the veil without a showing of fraud in the corporate form. The government has cited no case where there was actually a piercing of the veil without also the use of fraud. They've cited dicta and a lot of other cases, and cases where they just didn't get to the issue. The second reason why is that Rule 4 itself only identifies certain agents that you can serve through. Agents of the organization, the general agent, the managing agent, and agents legally authorized and appointed for service of process. It doesn't say and, it says or. Appointed or legally authorized. But in any event, it's a small number of specifically identified agents. And it would be peculiar to say it's those ones and also a bunch of other agents who come in under an ad hoc test. So why wouldn't somebody who's been found to be an alter ego be somebody who's legally authorized to receive service of process? That's what it says. Appointed or legally authorized. As a term of art, it's somebody who is appointed or authorized under state law for service of process. That's not what it says. Well, I would argue, and the way it's been construed, is it's basically those are the people who you say, this is going to be my agent of service of process under Delaware law. That's the appointed part, the legally authorized. I'm not sure why, I mean, the fact that they say appointed or legally authorized suggests there's means to. In any event, I think it would be more likely that it would be an authorization in advance as opposed to a veil-piercing thing. Veil-piercing, the first time this ever came into being was 2009 after 64 years of having this rule, which applied only to service in the United States. And one of the reasons I think you have to keep in mind when you're talking about all of the other extraordinary things floating around is the fact that ordinarily you construe things in the criminal law narrowly jurisdictionally to avoid extending American criminal law overseas. And the only time this ever kicks in, they say it's distinct, that it's alter ego doctrine, but the only time it ever has been used is to try to get around the domestic service of process requirement. And with that, I will reserve the remainder of my time for rebuttal. Thank you. That's fine. Thank you. So I believe we hear first from Mr. O'Shea. Good morning, Your Honors. Good morning. Tim O'Shea for the United States with Attorney Brian Levine from the United States Department of Justice, Computer Crime and Intellectual Property Division. So I'm going to talk about collateral order, and apparently I'm also going to talk about Vandamus as well. Attorney Levine will talk about the merits of the district court's decision. I'm going to talk about some things that came up during the defendant's argument. The first thing is Rule 4. He suggests that the United States concedes that we have not complied with Rule 4. Well, nonsense. We have complied with Rule 4. We have, as Judge Wood points out, we have served one organization. The indictment says they are one organization, and the United States respectfully submits that Cinebell is one organization. So can we pick apart Rule 4, then, because we've got 4C3C, and there are these people identified for organizational service. An officer, that didn't happen. A managing or general agent or another agent appointed or another agent legally authorized to receive service of process. And you certainly didn't mail a copy of the summons to the organization's last known address within the district, and it's awfully hard to say that this Houston Renton office was its principal place of business elsewhere in the United States. Within the United States. It was the principal place of business within the United States. Why is that true, though? Is all of the rest of their work in the United States done using shipping companies? Well, first of all, they were not very successful in selling wind turbines in the United States. The only four successfully sold and built in the United States were those four in Massachusetts, where we found the stolen coat within there. And once that was all erected, there were just a couple of fellows from Cinebell working there, just maintaining those turbines. But let's talk about the registered agent. I just want to know, who was served? Is it your theory that any agent of Cinebell USA is a general agent of Cinebell? What's exactly the theory? They're incorporated in Delaware. We serve their registered agent in Delaware. So the agent of the agent, essentially. So you serve Cinebell USA's agent in Delaware. And Cinebell USA's agent in Texas as well. In Houston, yeah. Yeah. Or Austin. Yeah. So it was one organization in this context. And I guess I understand why the Corps would be concerned where the United States would want to serve. I guarantee you that the United States government does not want a theory of single multinational enterprise. The State Department spent 25 years trying to convince the rest of the world that multinational enterprise liability was a bad idea. Right. So don't go there. In this context, Cinebell China is the brain of the one organization. And Cinebell USA is clearly an arm of the one organization. Cinebell China kept the books, paid the employees, paid the taxes, controlled every aspect. But do you have to fail, Pierce, to do this? I mean, to take this functional approach that you're arguing for? Alter ego is one way to think about whether or not it's one organization or not. And it was a way that was already out there, and courts had analyzed it under Cohen and Pangan and all the rest, and the United States followed suit here. It is a good way. Does one have to think of it that way? I don't think so. Rule 4 doesn't require that, but it's a good way. And if you look at it, you can say, hey, listen, this was one organization. So the other thing is, let's talk about mandamus. But to get back to collateral, I mean, so on the collateral order doctrine, I think one of the critical questions is the effectiveness of one's ability to raise the point after the final judgment. And so you have to be saying that despite actual notice, which obviously they had, despite everything else that went on, if they were to be convicted after a full proceeding and they were then to take an appeal, they would be able to argue that the summons was improperly served and they would be able to obtain some kind of relief on that basis. I presume watching the summons and the government would have to start all over again with a new summons somehow, which, by the way, it's nice of you to mention the Mutual Legal Assistant Treaty, but given the Chinese government 18 percent interest, it's a little inconceivable to me that the Chinese government would serve up its company for criminal prosecution. Well, that's a point that the United States made in its brief, yes. So yeah, that's what would have to happen. That's the point of the final order rule. Well, even though there are important rights. But you wouldn't argue that this is like Alvarez-Machain. It doesn't matter if they were brought into the court illegally. The conviction stands. I bet you would argue that, actually. Well, I would not rule that out. We'll cross that bridge when we come to it. That's yet another point of the final order rule. But it's also, it relates back, though, to the question whether it really is possible to obtain full relief after a final judgment. The point is we'll sort that out once we get there. Well, you can't sort that out. We have to decide right now whether an appeal, whether this is really something that's A, a final determination of the propriety of service, whether it's really simply not going to be reviewable after a final judgment, et cetera. Well, that is a factor. Of course, in Midland Asphalt, the argument was, hey, wait a minute. We will lose out on this right if you don't take up this grand jury secrecy violation right now. And the Supreme Court said, yeah, maybe, maybe. The question is whether it relates, whether or not the issue relates to a right not to face a trial at all. That's how you get, that's how you can use a collateral order doctrine. It's a right not to face a trial. So is it your understanding, maybe I should have asked Mr. Elwood this, that Sinovel China, that the parent is not contesting personal jurisdiction at this point? They have waived any? They have not contested personal jurisdiction. Because that would be the kind of thing you just don't have any authority over, as we have a right not even to be in the United States, you know, don't bother us. I'm not sure that would be a great argument, but I'm just trying to understand. It would be a lousy argument under collateral order doctrine, right, because we know it's a well-settled law that one cannot take a collateral order doctrine, interlocutory appeal to challenge personal jurisdiction. So if they argue on that, great, but they are not. But I'm just trying to put it in the we have a right not to stand trial at all. And personal jurisdiction when it's just state A versus state B in the United States is one thing. Sometimes personal jurisdiction, if it's a foreign entity, the Supreme Court has said, in cases like Asahi and in other cases, they've said there's an additional layer of concern if you're dragging a foreign company into U.S. court. Okay. Okay, well, they are not challenging personal jurisdiction. Although the district court did find personal jurisdiction in this case. So what about Vandamus? You said you're here to tell us about that, too. Well, I was a little surprised to be talking about it at all. Sinovell devoted a paragraph in its original brief to it and tried to incorporate it in its prior briefs. The United States pointed out that that is taboo, and the United States suggests that they have waived the issue by failing to develop it. Sinovell certainly can't. And after we say they've waived it, I would point out in their reply brief, Sinovell said nothing about Vandamus. They just talked about collateral order there. Sinovell cannot show patent error for the reasons that my colleague, Mr. Levine, will address. Sinovell would have to show that the district court clearly abused its discretion or the court somehow usurped its power, and that's not what happened here. Judge Kraft just carefully went through the case law, carefully reviewed it. Even if the court decides down the road that the district court was incorrect, which would surprise me, the district court did not go off the rails. So do you have any notion? One of the things your opponents are arguing is that this case is quite extraordinary. Do you have any notion of how many cases involve criminal prosecutions of foreign, either persons or particularly companies? The antitrust division does it sometimes when foreign companies violate the criminal provisions of the antitrust laws. But I'm just trying to think how often this comes up in U.S. courts. In the Western District of Wisconsin, not that often. Addison? No, I mean, there are not a great deal of these, Your Honor. Obviously, the United States Department of Justice and the United States collectively has been more aggressive because there have been more and more of these companies stealing intellectual property. One of the things the court's going to look at here is the public's interest. The public has an interest in seeing this case go forward. The public interest is that Cinevell should be held accountable. It's been 21 months, 21 months since the indictment. They haven't even been arraigned. Cinevell has abused this process and abused coming down here. They stole this company's intellectual property, and then they've essentially done a rope-a-dope while the victim company's been laying off their employees and struggling to stay alive. That's not fair. That's not fair to the American people. It's not fair to these employees. It's not fair to this company. I respectfully request that the court relatively quickly decide that there is no appellate jurisdiction and to return this case to the district court. Thank you. All right, thank you very much. Mr. Levine. Thank you, Your Honors. May it please the court, Brian Levine for the United States, to address the merits of service. Before you get going on that, I take it this indictment, I'm looking at it, involves trade secret theft, criminal copyright infringement. Is the Economic Espionage Act involved in this as well? Yes. One of the charges is 18 U.S.C. 1832, which is under the Economic Espionage Act. Now, the Economic Espionage Act has two sections. One covers theft of trade secrets for economic benefit. That's the section under which they are charged. The other section under which they are not charged, 1831, involves theft of trade secrets for the benefit of a foreign government instrumentality or agent. So they are not charged under that part. That's correct, Your Honor. But it's the government's position that the Economic Espionage Act is designed to have extraterritorial application, even the part that it doesn't focus on. That's correct. It says so directly in the statute. I believe it's 18 U.S.C. 1837. And it says specifically that if any act in furtherance of the theft of trade secrets occurs within the United States, there is extraterritorial jurisdiction. So Congress was quite clear on that matter. So the lower court correctly found that the government complied with Rule 4 by serving Sinovel through its quote, unquote, puppet, Sinovel USA. The lower court did not err, much less clearly err, in finding that, quote, Sinovel USA's sole function was and is to do the acts and bidding of Sinovel China while giving Sinovel China a jurisdictional firewall against liability and culpability. In short, the court properly found that Sinovel and Sinovel USA were alter egos. Now, Sinovel argues that the alter ego doctrine doesn't even apply to Rule 4. But no court has ever reached that conclusion. And whenever courts are dealing with organizations in any context, courts always overlay the general concept of alter ego. So we do have the problem, though, that rolling along through the rules process is at former, whatever he was, Deputy Attorney General Lonnie Brewer's request. The rule is in the process of changes are being proposed. Obviously, it still has to go to the standing committee. It's got to go to the conference. It's got to go to the Supreme Court. It's got to go to Congress. So there are many steps left. But why shouldn't that cause us to be cautious about assuming that all of that is just so much fluff and everything's already here? The fact that Rule 4 is being amended is a good thing, both for our appeal and for our country. It does not in any way hurt our appeal because the whole point of the rule, and Lonnie Brewer, if you read the letter that Lonnie Brewer wrote, he said, look, the only way we're able to serve foreign organizations at this point is under this alter ego theory or a similar general agency theory. And it's almost impossible, if you look at the history of case law, to prove an alter ego, even under the one element that is actually required here, which is that the two organizations are not really separate. They're really the same organization. So how do you, are you, as I read your brief, you accepted the district court's decision that Delaware law is the law that should regulate or should inform us on whether Sinovel U.S. is really just an alter ego of Sinovel China. But Delaware law does seem to look to fraud. And where's the fraud in this? It seems like they weren't really holding themselves out as anything but this little tiny office in Texas. Well, I actually, I disagree that we, that Delaware law requires fraud. And I'd like to point the court to its own decision in the Illinois Bell Telephone Company case, because that is the case that we basically followed in terms of what is the procedure here. Do you look to state law? Do you look to federal law? And what the Seventh Circuit said in that case is that Delaware law does not require showing a fraud, that it's enough that the government show the subsidiary, quote, simply functioned as a facade for the dominant shareholder, which is exactly what the lower court found here, that Sinovel U.S.A. was Sinovel China's puppet. Now, what the Illinois Bell case also said was that even if Delaware law did require fraud or was unclear, then the court could look to federal law. And federal law, the court is very clear in this circuit, most recently in 2012 in the Abilese v. OTP case, that no showing of fraud is required to pierce the veil for purposes of personal jurisdiction under federal law. So what's the argument for federal law as opposed to Delaware law? I know you preserved this point, at least, in the district court. That was your first choice, as I recall. Initially it was, because we're dealing with a rule of federal procedure here that's going to govern all federal criminal cases. So it does make sense to start with federal law. But federal law usually incorporates state law in things like what's a corporation or capacity or many, many questions. That's correct, Your Honor. And what the court said in Illinois Bell is that federal law does not require fraud, but if it did, it said, quote, a state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such law. So particularly where we're dealing with the public's ability to address a public wrong under a federal rule of criminal procedure, it wouldn't make sense to import an unnecessary obstacle from state law if that obstacle were indeed there. But as I said, this court has already found that it's not a requirement of Delaware law. But was the Illinois Bell case a case under Delaware law? It was, Your Honor. And I would note, Seineville cites a number of cases that it says show that Delaware requires fraud. But all of those cases fit into two categories. They're either substantive liability cases, not personal jurisdiction or service cases, or they're relying on personal jurisdiction or service cases. And most principally, they rely on a 1968 Delaware Supreme Court case called Pauli Petroleum. And I think the problem is that case reads like it's a personal jurisdiction case. But if you actually look at it closely, it's about substantive relief because there the plaintiff was seeking a mandatory injunction to make the subsidiary stop acting. And because they were seeking a mandatory injunction, that was substantive relief they were seeking. So the correct Delaware cases, we focus on HMG, which is a recent case by the Chief Justice of the Delaware Supreme Court when he was serving as Vice Chancellor. And in that case, he said there were two critical elements to piercing the veil in a personal jurisdiction context. Neither of those two elements was fraud. It was really that there be inadequate separation, that there be no real separation between the parent and the subsidiary, which is exactly what the district court found here. Yeah, I understand that to be your argument here, that they sent even the tax returns back to China for them to do, and they were a little casual with what payments from the U.S. bank account were made for. One of them was made for one of the Chinese companies' debts, as I recall. So your argument is that this is actually just like all these construction firms that we see who are shifting people around so they don't have to unionize, that they're actually all just one big group. Well, the district court found we presented 10 pages of evidence. Not of evidence, but 10 pages of argument on the different facts that support the alter ego theory here, and that was supported by hundreds of pages of evidence, including a grand jury transcript, extensive grand jury testimony of one of the few people from Sinovel that worked in the USA office that suggested that there were alter egos here. And essentially, I can't go through all of those facts. It would take more time than we have. But what the district court found and the lower court found was that Sinovel USA had none of its own employees or management, except for this one guy who was there for a short period of time, not around the time of service. It had no control over its finances. Sinovel China controlled every aspect of its operations and decision-making. Does it still exist as a company, by the way? I mean, did they wrap it up? Well, when our FBI agent went to Sinovel USA to ask them some questions, they quickly destroyed documents, removed it from the office, and sent everybody back to China, except for the one Chinese employee who decided to stay in the US. So technically, whether it still exists or not, I'm not sure, but it doesn't seem to be a going concern. So the Delaware Secretary of State would know, I mean, there would be a record if it's still a company. Well, under Delaware law, even when a company is dissolved, it's still amenable to service of process through its registered agent, as happened here. And by the way, in answer to your earlier Rule 4 question, there's no dispute that under Rule 4, we could serve at Sinovel through its registered agent if it had one in the US. Our argument is that Sinovel and Sinovel USA are the same organization, and so we can serve Sinovel USA's registered agent in the US. All right. Well, thank you very much. Thank you, Your Honor. Anything further? Mr. Elwood. Yes, please. A couple of points. First, I'd like to point out that the government's position in this case is that the Court of Appeals will never have an opportunity to review the question of whether service is proper in this case, that we can't do it now because it's too early, and that later it will be too late. And I think that that is a very good illustration of why the Court of Appeals doesn't have an opportunity. Where do you see them as taking the second half of that position? I'm sorry? Where do you see them as taking the second half of that position? That it's going to be too late? Well, because he said we'll cross that bridge when we come to it, that by appearing we may wind up like Alvarez-McChain where we showed up and our objection to how we got there is no longer justiciable. The second point I wanted to get to is this point about what Delaware law actually holds. I hate to do it, but I'm going to have to read to you again. Under EBG Holdings they say, and this is a quote, the plaintiff, this is in brackets, has failed to meet its burden of pleading the fraud element of alter ego jurisdiction, and that is under a section of the opinion that says jurisdiction, Meditech of Egypt, it does not suffice to supply the necessary fraud or injustice to hold the subsidiary to be the alter ego of the parent. So we're not just relying on the polypetroleum case. As I say, it's recently and repeatedly have required a proof of fraud in the use of the corporate form before they'll pierce the veil. Illinois bill is not to the contrary. They said there that fraud or basically it's just being used. I'll try to find the exact language the court used in Illinois bill, but it said they were closely related inquiries. And remember, Illinois bill was where it was just a husk. There were no assets in it. And the opinion said there no rational person would ever deal with such an organization unless they were defrauded, unless they were duped. So I don't think that is any basis for putting a gloss on Delaware fraud inconsistent with the opinions of the Delaware courts themselves that have spoken directly to this point. As far as the, it's a little bit far down the road on this, but as far as the formalities that were observed, EBG Holdings asked about whether, you know, any formalities, may I complete this off, whether any formalities were observed. And the reason why the tax returns were sent to China, why the checks were sent to China, was that the people who were authorized to sign for Sinoville USA were in China. They were dual head and employees. So that is not a sign of not observing formalities. It's a sign they did observe them. Thank you. All right. Thank you very much. Thanks, Mr. Elwood. Thanks to the government. We'll take the case under advisement.